**UNITED STATES of America, Appellee,**

v.

**Salvatore SALAMONE, Appellant.**

**No. 87–5803.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 18, 1989.

Decided March 6, 1989.

Rehearing Denied April 27, 1989.
As Amended May 8, 1989.

David L. Kurtz (argued), Lake Ariel, Pa., for appellant.

Karen Skrivseth (argued), U.S. Dept. of Justice, Washington, D.C., Albert J. Wicks, Philadelphia Strike Force, Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, and SEITZ and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### BACKGROUND

This matter is before this court on appeal by Salvatore Salamone from a conviction on certain firearms offenses in the United States District Court for the Middle District of Pennsylvania. The appeal involves application of double jeopardy and collateral estoppel principles as a result of Salamone's earlier prosecution in the United States District Court for the Southern District of New York. Thus, we must describe the proceedings in both courts.

On April 9, 1984, Salamone, along with numerous others, was indicted in the Southern District of New York on drug trafficking conspiracy and racketeering (RICO) counts, as well as conspiracy and substantive money laundering counts, in *United States v. Badalamenti*, Crim. No. 84-236 (S.D.N.Y.1984)—the infamous "Pizza Connection" case. Salamone's codefendants included Salvatore Greco, Gaetano Mazzara, Francesco Castronovo, Giuseppe Ganci and Salamone's brother, Filippo Salamone.[1] The counts significant to us are one and sixteen. Count one charged Salamone, among others, with conspiring to import and distribute narcotics, in violation of various sections of Titles 18 and 21 of the United States Code. Count one alleged that in furtherance of the conspiracy, Salamone had "... obtained, possessed, stored, concealed, transported and otherwise uti-

lized firearms...." It was charged that as overt acts in furtherance of the conspiracy, Salamone purchased a number of semi-automatic handguns, colloquially known as "MACs," using the fictitious names James Hamilton and Randall Thomas. *Badalamenti* indictment, ¶¶ 533–35. The indictment further alleged as overt acts Salamone's receipt of seven Colt semi-automatic rifles, Model AR–15; three Uzi–A model semi-automatic rifles; and a Ruger semi-automatic rifle. *Badalamenti* indictment, ¶¶ 531–32. Count sixteen charged that Salamone and various others participated in a racketeering enterprise; that they were members of an organization known as "La Cosa Nostra" or "the Mafia," the purpose of which was enrichment from narcotics trafficking through the methods and means set forth in count one, in violation of various sections of Titles 18 and 21 of the United States Code. Significantly, Salamone was not charged in the Badalamenti indictment with any substantive firearms offenses.

Salamone was convicted by the New York jury on the money laundering conspiracy and substantive money laundering counts, but acquitted on counts one and sixteen—the drug trafficking conspiracy and racketeering counts.[2]

In October 1984, an indictment was returned against Salamone in the Middle District of Pennsylvania, charging him with a variety of firearms offenses in violation of federal law. Counts one and two set forth charges for the possession of an illegally made and unregistered machine gun, in violation of 26 U.S.C. §§ 5861(c) & (d). Count four charged Salamone with conspiring to violate the federal firearms laws by falsifying firearms transaction records, and counts five and six charged Salamone with the substantive crime of falsifying firearms transaction records, in violation of 18 U.S.C. § 371, 18 U.S.C. § 924(a) & 18 U.S.

---

1. The names of these five codefendants in *Badalamenti* are spelled in several different ways in the various documents in the record. We have spelled the names as they appear in the *Badalamenti* indictment.

2. Although it convicted Salamone on the money laundering counts, the jury, as reflected by the verdict form, found that he had not committed these offenses in furtherance of a violation of the federal drug laws.

§ 2.[3] More specifically, counts five and six charged Salamone with using the fictitious names of James M. Hamilton and Randall C. Thomas when purchasing a total of six MACs, and count four charged him with conspiring to do so with one Daniel Jenkins.

Salamone was convicted on the five foregoing counts, but his conviction was reversed on appeal because of error in the juror selection procedure. *United States v. Salamone*, 800 F.2d 1216 (3d Cir.1986). Before his retrial, Salamone moved to dismiss the indictment or, alternatively, to prohibit the introduction of certain evidence at trial, asserting that his acquittal in New York barred the government from prosecuting him or introducing the evidence under principles of double jeopardy and/or collateral estoppel. In an opinion and order dated August 19, 1987, the district court denied his motion. A supplemental motion raising similar objections was denied on September 23, 1987.

At the ensuing trial, as the government notes, the evidence was broken down into two categories: evidence involving counts one and two, the machine gun counts, and evidence involving counts four through seven, the counts involving the purchasing of MACs in fictitious names. With respect to the former, the government sought to establish that Salamone bought a semi-automatic pistol at the Renco Home and Sport Center, Inc., in Bloomsburg, Pennsylvania, and thereafter converted it into a fully automatic weapon, or a machine gun, in violation of federal law. In support of its theory, the government introduced, *inter alia*, the testimony of Douglas Renninger, a Renco employee. Renninger testified that in 1981, Salamone purchased a semiautomatic weapon in his own name, signing the firearm transaction record required by federal law for any firearms transaction involving a licensed dealer,[4] as well as the state form required when purchasing a pistol. Tr. 73–76, 87–88. Renninger further testified that in 1983 Salamone brought the MAC, which had been converted into a fully-automatic weapon, back to Renco to have it fixed because it was not working properly, *i.e.*, it was functioning as a fully-automatic weapon, and that Salamone explained that "the FBI was checking up on him." Tr. 89, 94–96, 103. Daniel Wolfe, another Renco employee, corroborated some of Renninger's testimony in this regard. Tr. 254–56.

Salamone, testifying on his own behalf, admitted that he bought the gun, but claimed that Daniel Jenkins, a Renco employee, had, in 1982, converted it into a fully-automatic weapon without his knowledge. Tr. 1131–34. Dissatisfied with the gun, Salamone brought it back to Renco, again testifying that he was unaware that the gun had been converted into an automatic weapon. Tr. 1154–55, 1227.

The government sought to establish, with respect to the charges involving the purchases of MACs using fictitious names, that Salamone had purchased six MACs using the false names James Hamilton and Randall Thomas, as well as conspiring with Daniel Jenkins to do so. The government introduced evidence, including testimony from both Renninger and Jenkins, that in 1982 Salamone ordered seven AR–15s, three Uzis and six MACs from Jenkins, paying him a deposit for the weapons. Tr. 107–26, 529–32. The AR–15s were replaced with CAR–15s, a somewhat different version of the gun, at the request of Salamone and his brother. Tr. 154–57, 536–38. The seven CAR–15s and the three Uzis were delivered to Salamone or his brother Filippo in June 1982, and Salamone signed the requisite federal forms in his own name as the buyer of each weapon. Tr. 533–46. Salamone also bought a Ruger or elephant gun in June 1982, again signing the federal form in his own name. Tr. 548–50.

**3.** Count three involved the unlawful transfer of an unregistered firearm, and count seven charged Salamone with using the fictitious name Roger P. Hall when buying a firearm. Salamone was acquitted on count three after his first trial in Pennsylvania and on count seven after his second trial in Pennsylvania. Thus, we are not concerned with these counts on this appeal.

**4.** *See* 18 U.S.C. § 923(g).

In July 1982, after a shipment of MACs arrived at Renco, Jenkins brought the necessary federal forms, as well as the state forms required for pistols, to Sal's Place, a restaurant owned by Salamone. Tr. 554–55. Salamone told Jenkins that he did not want to fill out the forms in his own name and that if Jenkins did not go along with falsifying the forms he would not buy the weapons. Tr. 555, 658–60.[5] Jenkins agreed to the proposed falsifications and, along with Salamone, filled out both the state and federal forms using the phony names James M. Hamilton and Randall C. Thomas, as well as fictitious addresses and identifying characteristics. Tr. 555–64, 652–55, 660, 663–66, 669–72. Jenkins testified that the MACs ultimately were delivered to Salamone. Tr. 568–69. Renninger testified that when he sought to collect money due for the guns purchased by Salamone, including the MACs, Salamone did not deny buying the MACs, but only disputed the amount of money he owed, and made a payment to settle the account. Tr. 152–53.[6]

The government also introduced testimony of FBI agents who, in executing search warrants, discovered some of the MACs bought in false names at three locations in New Jersey: Sal's Pizza (owned by Sal Greco, not appellant), a Nutley apartment, and Pizza Village. Tr. 720–46. The agents' testimony established that some of the guns for which Salamone had signed federal forms also were found at Sal's Pizza and the Nutley apartment. *Id.*

The government introduced evidence which it describes as connecting "various figures in the 'Pizza Connection' investiga-tion to the site of the three searches" during which MACs were found. Brief at 13 n. 11. This evidence consisted of testimony of FBI agents that individuals involved in the Pizza Connection investigation came and left the three sites. Tr. 747–83, 806–16. The government also introduced telephone toll records which it describes as showing "calls between Sal's Place [Salamone's restaurant], Sal's Pizza, and the other places searched and persons observed during the surveillance." Brief at 37; tr. 818–21. The government, though, never identified these individuals as being involved with La Cosa Nostra or the Mafia or with a drug conspiracy.

Salamone testified that he accepted delivery of the CAR–15s and Uzis, but did so on behalf of his brother, Filippo, and that he signed the federal forms believing them to be receipts. Tr. 1168–97. He further testified that he ordered the Ruger for Filippo and gave it to him. Tr. 1097–1100. Salamone flatly denied purchasing the MACs in false names, stating that he refused to buy the guns or sign the federal forms because the weapons were for his brother Filippo, not for himself. Tr. 1192–98. He testified that Filippo was the purchaser of the MACs. Tr. 1352, 1372.

With a number of qualitative exceptions to be discussed shortly, the government does not dispute that the challenged evidence in the instant case paralleled evidence submitted against Salamone in *Badalamenti.*[7]

Salamone was convicted on counts one, two, four, five and six and was sentenced as follows: on counts one and two, to two concurrent four-year terms of imprison-

---

**5.** Jenkins testified that Salamone told him that he was going to sell the MACs to someone else and wanted to avoid filling out state forms again for the transfer. Tr. 659.

**6.** The government also introduced, *inter alia,* evidence of what it characterized as self-incriminating statements made by Salamone to Jenkins with respect to falsifying the records when Jenkins was cooperating with federal authorities and wearing a body transmitter, Tr. 322–25, and evidence that Salamone's fingerprints were found on the Hamilton form, Tr. 877–79.

**7.** Some portions of the record from *Badalamenti* have been submitted as part of the record in the instant case. The indictment in *Badalamenti* and the court's charge to the jury appear in their entirety. However, we have been able to locate only a small portion of the *Badalamenti* transcript, which consists of the testimony of Douglas Renninger and of Daniel Wolfe. Renninger's testimony paralleled his testimony at Salamone's Pennsylvania retrial with respect to the machine gun counts, as well as Salamone's alleged purchase of the other weapons. *Badalamenti* tr. at 16,033–34, 16,058–63, 16,064–67. Wolfe's testimony corroborated part of Renninger's. *Badalamenti* tr. 16,267–86.

ment and a $5,000 fine on count one; and on counts four through six, to three consecutive four-year terms of imprisonment and three $5,000 fines, for a total of 16 years of imprisonment and fines of $20,000. Salamone then appealed the district court's denial of his pretrial motion, which is the appeal presently before us.

*DISCUSSION*

In the seminal case *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the defendant was charged with robbing just one of a group of six poker players. At trial, the evidence unequivocally established that three or four robbers had stolen property from each one of the poker players; in dispute was whether the defendant had been one of the robbers. Defendant was acquitted, but thereafter was prosecuted for robbing *another* one of the poker players and was convicted.

The Supreme Court held that the second prosecution was unconstitutional; that collateral estoppel was part of the Fifth Amendment's guarantee against double jeopardy, and that under collateral estoppel principles, the second prosecution was barred. It explained, first, that

'[c]ollateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Id.* at 443, 90 S.Ct. at 1194. It then held that when applying collateral estoppel principles in criminal cases, a court must

'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'

*Id.* at 444, 90 S.Ct. at 1194 (citation omitted). Applying this rule to the facts before

it, the Court held that in the first prosecution, "[t]he single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers," and that the second prosecution therefore was impermissible. *Id.* at 445, 90 S.Ct. at 1195.[8]

This court has previously stated that collateral estoppel not only has a "constitutional scope" as set forth in *Ashe*, but also has a "doctrinal scope." *United States v. Keller*, 624 F.2d 1154, 1158 (3d Cir.1980). In *Keller*, the defendant, notwithstanding his defense of entrapment, was convicted of conspiracy to distribute a controlled substance. The government, to undermine the entrapment defense, introduced evidence of the defendant's participation in a drug transaction which took place subsequent to the period covered by the indictment, and for which he had been acquitted after a prior federal prosecution. The defendant argued on appeal that the evidence of his involvement in the separate drug transaction was inadmissible "because the doctrine of collateral estoppel bars the *evidentiary* use of conduct for which defendant had been acquitted." *Id.* at 1156 (emphasis added). The court agreed, stating that "[i]n this court, the doctrine of collateral estoppel as applied in criminal cases has been used to bar not only reprosecution, which we use here as encompassing multiple or fragmented prosecutions, but also evidence of crimes of which the defendant had been acquitted in prior prosecutions." *Id.* at 1157 (citing *United States v. Simon*, 225 F.2d 260 (3d Cir.1955); *United States v. DeAngelo*, 138 F.2d 466 (3d Cir.1943)). The *Keller* court quoted from our earlier opinion in *United States v. Venable*, 585 F.2d 71, 78 (3d Cir.1978), which concluded that "'[The *DeAngelo* and *Simon* cases] retain their vitality ... to the extent that they would allow the *defense* of collateral estoppel to be raised in a second proceeding as to facts previously established but not *necessary* to sustain the conviction sought at retri-

---

**8.** The Court had earlier noted that the judge in the first prosecution had instructed the jury "that if the petitioner was one of the robbers, he was guilty under the law even if he had not personally robbed" the particular poker player named in the charge. 397 U.S. at 439, 90 S.Ct. at 1192.

al.'" 624 F.2d at 1159 (emphasis in *Venable*).

In sum, this court recognizes two principles of collateral estoppel in criminal cases: first, that where a jury's acquittal of a defendant in a first prosecution necessarily was grounded upon its resolution of a particular issue, reprosecution is constitutionally barred where redetermination of the issue would be essential to the defendant's conviction, and second, that the government is collaterally estopped from relitigating the issue even if a contrary resolution is *not* necessary to convict the defendant, but simply would constitute evidence against him or her.

Salamone raised both of these collateral estoppel principles in his pretrial motion as grounds for barring his reprosecution or, alternatively, barring the introduction of evidence that was introduced in *Badalamenti*. The district court summed up his argument as follows:

[Salamone] asserts that because the Government sought to prove in New York that he obtained, stored, possessed, concealed, transported, and otherwise utilized firearms to facilitate the narcotics and racketeering conspiracies charged in counts 1 and 16 of the New York indictment, it cannot now prosecute him for illegally possessing various firearms and for obtaining and conspiring to obtain firearms by making false statements. In the alternative Salamone argues that the Government cannot now reintroduce the evidence concerning Salamone's allegedly obtaining, storing, possessing, concealing, transporting, or otherwise using firearms that was introduced in his New York trial.

The district court rejected each of Salamone's arguments. It stated first that under both *Ashe* and *Keller*, "the Government is only barred from relitigating issues litigated or reintroducing facts introduced in the trial leading to acquittal if the jury necessarily grounded its verdict upon the issues or facts which the Defendant seeks to foreclose" (citing *Ashe; United States v. Hill*, 550 F.Supp. 983 (E.D.Pa.1982), *aff'd*, 716 F.2d 893 (3d Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984)). It continued that based upon its review of the evidence, charge and verdict in *Badalamenti*, it was evident that "[t]he jury could have acquitted Salamone on the narcotics and racketeering conspiracies without giving *any* consideration to the issues and facts concerning firearms." The court emphasized that in *Badalamenti*, the trial court had instructed the jury in part as follows:

A word now about guns. You have heard evidence of the acquisition, possession and concealment of guns. You *may* consider this evidence along with all the other evidence in this case. Remember though that the charges in this case are basically of narcotics conspiracy or enterprise. No Defendant is charged with a violation of any law concerning firearms.

The court concluded that the "jury could have acquitted Salamone of conspiring to import and distribute narcotics and conspiring to engage in racketeering upon finding that the Government failed to carry its burden on one of the essential elements of the narcotics and racketeering conspiracies charged in Counts 1 and 16." [9] It therefore denied Salamone's motion. For the reasons that follow, we will affirm in part and reverse in part. [10]

**9.** The court elaborated:

For example, the jury could have concluded that Salamone (1) did not have the specific intent to further the narcotics conspiracy's illegal purpose; (2) did in fact obtain, store, possess, conceal, transport or otherwise utilize firearms, but did not do so to facilitate the narcotics conspiracy; (3) did not intentionally, willfully, and knowingly join the conspiracy to import, manufacture, and distribute narcotics; (4) did not associate with the alleged criminal enterprise; (5) did not willfully and knowingly conspire with at least one other person to participate in the affairs of the enterprise; or (6) did not commit or conspire to commit at least two racketeering acts.

**10.** Salamone challenges his conviction on a number of grounds in addition to those involving collateral estoppel principles. Specifically, he argues that (1) the district court judge should have recused himself; (2) the government's evidence regarding the chain of custody of the weapon involved in counts one and two was deficient; (3) the district court erroneously excluded certain evidence; and (4) the district court improperly permitted the government to impeach his credibility through evidence of his partial conviction in New York. We have re-

First, we agree with the district court's determination that Salamone's prosecution in Pennsylvania was not barred under *Ashe*.[11] The theory of the government's case in *Badalamenti* was that Salamone had purchased the very CAR–15s, Uzis, Ruger and MACs involved in the instant case in furtherance of the charged narcotics conspiracy and racketeering enterprise. However, as the district court in this case noted, the *Badalamenti* court charged the jury that no defendant was charged with violating any firearms law, and further emphasized that the jury could not "find any defendant guilty solely by reason of his purchasing or possessing guns." *Badalamenti* tr. 41,415. The court also charged that in order to convict a particular defendant on the narcotics conspiracy count, the jury had to find that a conspiracy existed, *Badalamenti* tr. 41,442–46; that at least one overt act was committed by *any* one of the defendants, *Badalamenti* tr. 41,422, 41,453–54;[12] and that the particular defendant was a member of the conspiracy in that he "intentionally, knowingly and ... willfully joined in that conspiracy with the specific intent to further its illegal purpose." *Badalamenti* tr. 41,442. Similarly, the court charged that one essential element of the RICO charge was that the defendant "willfully and knowingly conspired with at least one other person to participate in the affairs of that enterprise through a pattern of racketeering activity." *Badalamenti* tr. 41,503.

It is evident that the *Badalamenti* jury did not necessarily ground its partial acquittal of Salamone upon the issues which Salamone seeks to foreclose from consideration here—whether he possessed an illegally made and unregistered machine gun, or purchased or conspired to purchase MACs using fictitious names. For instance, the jury could have decided that Salamone committed the substantive crimes charged in this case, yet lacked the requisite intent to participate in the racketeering enterprise.[13] The jury necessarily *did* decide that Salamone was not a mem-

---

viewed each of these arguments and find them lacking in merit.

Salamone also argues that the same three specific categories of evidence to which he objects on collateral estoppel grounds, *see infra*, should have been excluded on the alternative ground that the prejudicial effect of the evidence outweighed its probative value under Fed. R.Evid. 403. To the extent that we hold that portions of this evidence were improperly admitted under principles of collateral estoppel, it becomes unnecessary to address Salamone's Rule 403 argument. With respect to the remainder of the evidence, we reject Salamone's claim of error. Of course, in barring evidence on collateral estoppel grounds we are applying legal precepts and our review is plenary as it is with respect to our determination that reprosecution is not barred.

11. The government maintains that the validity of Salamone's conviction on counts one and two of the Pennsylvania indictment is not in any way called into question under collateral estoppel principles, noting that "[t]he counts relating to possession of an unregistered machine gun were not charged as overt acts in the *Badalamenti* indictment." This observation, although correct, is not dispositive of the collateral estoppel issues; the government did introduce *evidence* in *Badalamenti* relating to these offenses, and a perfunctory affirmance of Salamone's conviction on these counts therefore would be

inappropriate. For reasons discussed elsewhere in the opinion, however, Salamone's conviction on these counts will be affirmed.

12. The court charged as follows:

The government is not required to prove that the particular defendant whose verdict you are considering did an overt act.... It is sufficient if the government proves that at least one conspirator did at least one of the those overt acts charged intentionally for the purpose of advancing the illegal plan. If so, this element has been proved against all the members of the conspiracy.

*Badalamenti* tr. 41,454.

13. With respect to the RICO count, the *Badalamenti* court charged the jury that other elements of the offense included association with the criminal enterprise, and the commission or conspiracy to commit at least two racketeering acts. *Badalamenti* tr. 41,503. As the district court in the instant case recognized, the *Badalamenti* jury also could have determined that although Salamone purchased and conspired to purchase the MACs involved in this case, he did not associate with the criminal enterprise or, alternatively, did not commit or conspire to commit at least two racketeering acts—the verdict form in *Badalamenti* did not list any acts involving weapons as racketeering acts under Salamone's name.

228

ber of the narcotics conspiracy;[14] its conviction of numerous other defendants on count one indicates that the other two elements of the offense as charged, that a conspiracy existed and at least one overt act was committed by any one of the defendants, had been established to its satisfaction. Such a finding, however, is clearly not inconsistent with a finding that Salamone did in fact possess an illegally made and unregistered machine gun, or purchase and conspire to purchase MACs using fictitious names, as he could have done these things without being part of the conspiracy.

*United States v. Pappas*, 445 F.2d 1194 (3d Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971), involved facts analogous to those here. There, the defendant, a bank vice-president, was indicted on nine counts. Count one alleged that he had conspired, *inter alia*, to "make or cause to be made false entries in the books of the Bank with the intent to defraud the Bank and the Federal Deposit Insurance Corporation." *Id.* at 1195. Count seven alleged that defendant "made or caused to be made false entries in the accounts receivable ledger of the Bank." *Id.* at 1196. At the close of the government's case, the district court judge dismissed, among others, the conspiracy count, stating that it had failed to find that the conspiracy had as its object any of the substantive violations alleged in the indictment. *Id.* at 1198. Counts six and seven, though, remained outstanding. However, on motion of the defendant a mistrial was declared on those counts because of the prejudice to the defendant from the jury having heard the testimony on the dismissed counts.

The defendant was retried on counts six and seven and convicted on both, though the court then entered a judgment of ac-

quittal on count six for reasons not germane here. On appeal, the defendant raised the argument that under *Ashe*, "his acquittal on count one, the conspiracy count, at the close of the first trial collaterally estopped at the second trial his conviction of the substantive offense charged in count seven." *Id.* at 1197.

We, however, rejected defendant's contention. After we noted that there was no need to reconstruct the basis for the acquittal in the first case because the district court had specified its reasons for dismissing the conspiracy count, *id.* at 1197–98, we reasoned:

> it is a prerequisite for the invocation of the doctrine of collateral estoppel that the first acquittal foreclose the possibility that a rational jury might base its verdict in the second prosecution upon a ground other than that decided by the first acquittal. Here, such possibility was not precluded because there is no inconsistency in finding that [defendant] did not participate in a conspiracy having as its object the making of false entries in the Bank's ledgers and in finding that in fact he did make, or cause to be made, such entries.

*Id.* at 1198.[15]

The court's reasoning in *Pappas* is equally applicable here. We hold that Salamone's prosecution in Pennsylvania was not barred under *Ashe*.

■ Salamone contends that even if his Pennsylvania prosecution was not barred under *Ashe*, the district court erred in admitting evidence that had been used against him in New York under "doctrinal" collateral estoppel principles. We note first that the district court properly rejected his argument that *any* evidence introduced in New York should have been barred at his subsequent Pennsylvania tri-

---

14. As noted earlier, the district court stated that the jury could have determined that Salamone (1) did not intentionally join the conspiracy; (2) did not have the specific intent to further the conspiracy's illegal purpose; or (3) did not acquire the firearms at issue in this case in order to facilitate the narcotics conspiracy. Whatever analysis was made, the bottom line is the same:

the jury found that Salamone was not a member of the narcotics conspiracy.

15. *Cf. United States v. DeAngelo*, 138 F.2d 466, 469 (3d Cir.1943) (acquittal of substantive charge of robbery does not bar separate prosecution for conspiracy to rob; no question of double jeopardy is involved).

al. Because the New York jury did not necessarily decide that Salamone was innocent of possessing an illegally made and unregistered machine gun or falsifying and conspiring to falsify firearms transaction records, the government was entitled to introduce evidence at Salamone's Pennsylvania trial to establish that he did in fact commit these offenses even though the evidence paralleled evidence introduced in *Badalamenti*. In *Pappas* this court rejected an argument similar to that Salamone now makes, reasoning:

> Here, the single fact decided by the judgment of acquittal was that [defendant] had not participated in a conspiracy having as its object the making of false entries in the Bank's ledger. In the second trial the Government did *not* ... introduce evidence of which the only purpose could be to prove a fact already decided by the prior acquittal. [The challenged] testimony was relevant to, and in fact did, demonstrate that [defendant] himself, as distinguished from participating in a conspiracy, caused false entries to be made. Since the judgment of acquittal in the conspiracy count did not decide whether false entries had been made as a result of [defendant's] conduct, the jury in the second trial might consistently find ... that false entries were, in fact, made.

445 F.2d at 1199 (emphasis in original); *see also United States v. Bennett*, 836 F.2d 1314, 1317–18 (11th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988); *United States v. Bolinger*, 796 F.2d 1394, 1406–07 (11th Cir.), *modified on other grounds*, 837 F.2d 436 (11th Cir.1988), *cert. denied*, —— U.S. ——, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988).

With respect to counts one and two of the Pennsylvania indictment, we note that the record in this case includes the transcripts of the testimony of Renninger and Wolfe in *Badalamenti*, portions of which parallel their testimony in Pennsylvania relating to Salamone's possession of a machine gun. *See supra* note 7. The submission of these transcripts indicates that Salamone found the testimony of these witnesses at his Pennsylvania trial to be objec-

tionable. However, in light of the foregoing discussion, it is clear that the bare fact that Renninger and Wolfe testified in New York regarding, *inter alia*, Salamone's possession of an illegally made and unregistered machine gun does not serve to preclude them from so testifying in Pennsylvania. This seems to be Salamone's only objection to the evidence underlying his conviction on counts one and two of the Pennsylvania indictment. In fact, he never expressly challenges the testimony of these witnesses in his brief on appeal, and at oral argument his attorney conceded that Salamone's conviction on counts one and two raises no collateral estoppel concerns. Accordingly, we will affirm his conviction on these counts.

The fact that an across-the-board ban of any evidence introduced in New York would have been inappropriate, however, does not necessarily mean that the government was permitted to introduce *all* of this evidence. Salamone suggests that even if some of the evidence introduced against him in New York was readmissible in Pennsylvania, the government should have been collaterally estopped from introducing the testimony of certain FBI Agents and testimony regarding certain telephone calls, because in introducing this evidence the government sought to relitigate Salamone's participation in the *Badalamenti* narcotics conspiracy, despite his acquittal of such participation in New York. Brief at 26. The district court did not directly address this argument.

The evidence of this character can be broken down into three categories, two of which we now consider and the third of which we discuss later. First, Salamone objects to the testimony at the Pennsylvania trial of FBI agents who conducted surveillance of various defendants in the *Badalamenti* case in 1983 and 1984. Specifically, Agent James Lott testified that in May 1983, he saw Filippo Salamone going between his home and Sal's Pizza, and supervising construction work inside the store. Tr. 748–53. Agent John Gallagher testified that in March 1983, he observed Filippo Salamone, Salvatore Greco and oth-

ers working at Sal's Pizza, and that in May 1983 he saw Filippo Salamone proceed from his home to Sal's Pizza. Tr. 762–65. Agent Richard Kaier testified that in June 1983, he observed Filippo Salamone and Greco arriving at Sal's Pizza and leaving together; and that in both December 1983, and January 1984, he saw Gaetano Mazzara and Francesco Castronovo arriving at and departing from Pizza Village together, as well as observing Mazzara arriving and departing alone. Tr. 769–76. Agent John Mauzey testified that in April and May 1983, he observed Giuseppe Ganci going between his home and the Nutley apartment. Tr. 779–81. Agent William Buffaloe testified that in April 1983, he observed Filippo Salamone go from his home to Sal's Pizza, and that in January 1984, he observed Mazzara and Castronovo together, as well as observing Mazzara arriving at and departing from Pizza Village. Tr. 807–10. Finally, Agent Maureen McAvoy–Amaya testified that in April 1983 she saw Castronovo and Mazzara arrive together at Sal's Pizza and place something in Castronovo's van. Tr. 814–15.

On cross-examination, all of these agents testified that they never observed Salamone at any of the locations, or in the company of any of the persons, under surveillance.

Salamone also objects to the district court's allowance of evidence that telephone calls were made in 1982 and 1983 between the following locations: Sal's Place (Salamone's Restaurant) and Sal's Pizza; Sal's Pizza and Castronovo's residence; Sal's Pizza and Mazzara's residence; Filippo Salamone's residence and Sal's Place; Filippo Salamone's residence and Ganci's residence; Ganci's residence and the Nutley apartment; Ganci's residence and Castronovo's residence; Ganci's residence and Mazzara's residence; and Castronovo's residence and Two Boys from Italy Restaurant (also owned by Salamone). Tr. 818–21.[16]

Although the record in this case does not contain those portions of the *Badalamenti* transcript consisting of the parallel testimony of these FBI agents and evidence of the telephone calls, there is no dispute that similar evidence was produced by the government at Salamone's New York trial.[17]

In its brief on appeal, the government itself describes the foregoing evidence as "connect[ing] various figures in the 'Pizza Connection' investigation" to Sal's Pizza, Pizza Village and the Nutley apartment, where the MACs allegedly purchased by Salamone in fictitious names were found. Brief at 13 n. 11. At a hearing before the district court, the government proffered two reasons for introducing this evidence in response to Salamone's motion to exclude it under Fed.R.Evid. 403. The government maintained, first, that it sought to establish that Salamone had a

---

**16.** The parties entered into a stipulation during Salamone's trial that the foregoing telephone calls had been placed, and the government read the stipulation to the jury in lieu of presenting direct evidence that the calls had been made. Tr. 818. The stipulation was, of course, entered into after the district court's denial of Salamone's motion to exclude evidence on collateral estoppel grounds.

**17.** We are aware that a number of courts have stated that a criminal defendant has the burden of establishing that collateral estoppel applies by virtue of an issue having been decided in his favor at an earlier trial, and thus has the responsibility of submitting the relevant portions of the record from the prior proceeding. *See, e.g., United States v. Giarratano,* 622 F.2d 153, 156 (5th Cir.1980); *United States v. Lasky,* 600 F.2d 765, 769 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). However,

in the absence of any dispute as to the content of the testimony from *Badalamenti* at issue here, we decline to dispose of Salamone's appeal on the ground that there was inadequate proof of the record from *Badalamenti. Cf. United States v. Dowling,* 855 F.2d 114, 121 (3d Cir. 1988) (although "no extrinsic evidence of the record in the earlier case against [defendant] was introduced," the court nonetheless was able to determine that collateral estoppel barred introduction of certain evidence at the second trial). We caution, however, that we by no means condone the seemingly haphazard submission of portions of the transcript from prior proceedings that occurred in this case; the record, although it is sufficient to enable us to reach the merits of Salamone's appeal, might understandably have misled the district court as to the substance of his argument.

motive for falsifying the firearms transaction forms, explaining:

there's some connection between these people and we think that it shows the motive of the defendant for falsifying the forms.... The motive being that he had some understanding that these, you know, were going to be used for some nefarious purposes which we don't specify which we won't argue but that there obviously was some purpose ...

Tr. 713. The government further asserted that it sought to introduce this evidence in order to establish a link between the locations where the firearms were found; that "[t]hese locations are some distance apart and if we don't put on some evidence to show that there is some connection between these places it sort of looks like one day [the guns] all dropped out of the sky and ended up at these locations." Tr. 715. The government proffered similar reasons for introducing the evidence in its brief on appeal. Brief at 38–39.[18]

Salamone characterizes the foregoing evidence as establishing that he "was a member of the Mafia, La Cosa Nostra or the Sicilian Brotherhood" involved in the Pizza Connection narcotics conspiracy, brief at 25, and maintains that the government should have been collaterally estopped from introducing the evidence in view of his acquittal in New York on the narcotics conspiracy charge. The government responds that "[t]here is no reference in the record to the Mafia or organized crime, or to drug trafficking." Brief at 40 n. 23. Aware that introducing evidence implicating Salamone in the Pizza Connection narcotics conspiracy would be problematic, the government took pains, in its own words, to "sanitize" the evidence in this case, conscientiously avoiding any references to drugs or the Mafia. Tr. 715 (Rule 403 hearing).

■ Nonetheless, we are constrained to hold that the testimony of FBI agents that various individuals involved in the Pizza Connection case went to and from the three locations where the firearms at issue here were found was improperly admitted, despite the fact that these individuals were never identified as members of the Mafia or as involved in a narcotics conspiracy. Greco, Mazzara, Castronovo and Ganci were not identified by the government as being connected with the instant case in any significant manner *other* than their unexplained association with the three locations where the MACs were found and, by implication, with Salamone.[19] Although Salamone claimed that it was his brother Filippo who purchased the MACs in false names, the government's proof of Filippo's association with the locations where the guns were found does not seem to have been calculated to rebut Salamone's defense.[20] Rather, the inescapable implication of this evidence is that pursuant to his connection with these individuals Salamone acquired the weapons at issue here; that there was some sort of nefarious conspiracy, the specific purpose of which was not disclosed.

However, as discussed earlier, the New York jury, in acquitting Salamone, necessarily decided that he was *not* a member of the narcotics conspiracy at issue in *Badalamenti*, rejecting an inference from this testimony essentially indistinguishable from the one that the government desired the Pennsylvania jury to draw. The fact that the government did not reveal at the Pennsylvania trial that the hinted-at scheme involved narcotics cannot legitimize the introduction of this evidence. Salamone was acquitted of participation in a

---

**18.** The government, once again, gave its reasons for introducing this evidence in the course of analyzing whether the evidence was admissible under Fed.R.Evid. 403, upon which Salamone relies in the alternative to bar the introduction of the evidence.

**19.** Greco *was* identified as the owner of Sal's Pizza. *E.g.,* Tr. 721.

**20.** In fact, the government maintains in its brief that "[t]he evidence concerning the location of the weapons and their association with places frequented by appellant's brother Filippo *and his associates* served to further connect the offenses to appellant," brief at 39, (emphasis added), again indicating that the purpose of the evidence was to suggest Salamone's involvement in some undisclosed scheme with this group.

narcotics conspiracy with these individuals, and introducing evidence paralleling that introduced in *Badalamenti* to suggest that he somehow consorted with them for some evil purpose is, ultimately, a veiled attempt to relitigate his involvement in the conspiracy.

As noted above, the government itself maintains that the evidence was relevant to establish, in part, that Salamone had a motive for falsifying the forms at issue here; thus, his association with these individuals for a "nefarious" purpose. Although the government further asserts that the evidence established a connection among the locations where the guns were found, this connection is the very conspiracy the existence of which could not be relitigated. *Cf. United States v. Gonzalez–Sanchez*, 825 F.2d 572, 583–84 (1st Cir.1987) (where government sought to prove, in second trial, "same ultimate fact" of defendant's involvement in a conspiracy which had been resolved in defendant's favor in first trial, evidence should have been barred under collateral estoppel principles).

It might perhaps be argued that the surveillance testimony was properly allowed because while the jury in *Badalamenti* found that Salamone was not involved in a narcotics conspiracy, its verdict was not necessarily based upon a finding that various individuals who *were* part of the drug ring did not in fact visit the locations where the guns were found, or even that Salamone did not have some kind of suspicious connection with these people, but simply upon a finding that the connection was not narcotics related. However, we believe that drawing such a distinction would run contrary to the principles underlying the case law in this circuit. For instance, in *Keller* we rejected the government's argument that it was not collaterally estopped from introducing evidence of the defendant's participation in a drug transaction, for which participation he had been acquitted, because the defendant did not assert that he had not actually so participated, but only that he had been entrapped. The court stated,

> [To] hold that the prior conduct is admissible notwithstanding the determination by the earlier fact finder that the defendant's state of knowledge and level of participation did not satisfy the requirement of the criminal law ... would eviscerate the effect of the prior acquittal.

*Id.* at 1160.[21] As one court has explained, the *Keller* court rejected the government's attempt to draw a "distinction between a concrete fact and an inferred conclusion" for collateral estoppel purposes. *Petrucelli v. Smith*, 544 F.Supp. 627, 642 (W.D.N.Y. 1982), *vacated on other grounds*, 735 F.2d 684 (2nd Cir.1984).[22] Here, as in *Keller*, the actual facts attested to by the FBI agents conducting surveillance may not have been in dispute; however, the inference that the government sought the jury to draw from those facts—that Salamone purchased various weapons as a participant in a conspiracy—already had been decided in Salamone's favor by a prior jury. Allowing the government to introduce these facts was inconsistent with our analysis in *Keller*. We accordingly hold that the government should have been collaterally estopped from introducing this evidence at Salamone's Pennsylvania trial.

For the same reasons, the evidence that various telephone calls were made among

---

**21.** Similarly in *United States v. Dowling*, 855 F.2d 114, this court held that the government was estopped in a robbery case from introducing evidence of a prior attempted robbery for which the defendant had been acquitted, notwithstanding the government's argument that defendant's presence at the scene of the prior attempted robbery had not been in dispute, but only his criminal intent. The court reasoned:

> Even assuming that [defendant's] identity and presence in [the victim's] house were not specifically disputed, we believe that the government cannot legitimately assert that evidence concerning one element of an offense is separable for evidentiary purposes from a jury's general verdict of acquittal merely because it was not directly contradicted.

855 F.2d at 122.

**22.** *But see United States v. Davis*, 809 F.2d 1194, 1206 (6th Cir.) *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987) (where defendant acquitted of charge of distributing heroin after raising defense of entrapment, government permitted to introduce evidence of heroin distribution in subsequent trial for conspiracy).

the *Badalamenti* co-conspirators and the three locations where the MACs were found should have been excluded, with the exception of evidence that calls were made between Sal's Place—Salamone's restaurant—and Sal's Pizza. As explained below, this evidence, as well as the third category of evidence to which Salamone objects, goes *directly* to Salamone's culpability on the charges in the instant case, an issue which the *Badalamenti* jury did not necessarily decide, and therefore was properly admitted.

Although our holding that the evidence just discussed was improperly admitted requires us to reverse Salamone's conviction on counts four through six, as the government does not contend that its admission was harmless and we do not think it was to the extent that it impacted on the verdict on these counts, we will discuss the third category of evidence to which Salamone objects, even though it was properly admitted, as guidance to the parties on remand.

This third general category of evidence consists of the testimony of the three FBI agents who found the MACs that he allegedly bought using fictitious names, along with some of the weapons which he concededly bought in his own name, in the course of executing search warrants of Sal's Pizza, Pizza Village, and the Nutley apartment. Specifically, Agent Gregg Forry testified that on April 9, 1984, while conducting a search of Sal's Pizza, he retrieved an Uzi and a MAC from a duffle bag located in the ceiling of the pizza shop. Tr. 721–28. Agent Ronald Butkiewicz tes-

tified that on April 4, 1984, he was involved in a search at Pizza Village during which two MACs were found in a heating duct in the ceiling. Tr. 731–37. Finally, Agent Marc Greenberg testified that on April 9, 1984, in the course of conducting a search of the Nutley apartment, a MAC, two CAR–15s, and a box containing ammunition were found in the attic.[23] Tr. 740–44. Counsel for Salamone elicited testimony from these agents that they never saw Salamone at the locations where the weapons were found.

Once again, while the record in this case does not contain the parallel portions of the *Badalamenti* transcript, there is no dispute that the testimony of agents Forry, Butkiewicz and Greenberg was a "sanitized" version of testimony in *Badalamenti*. During the Rule 403 hearing before the district court, for instance, the government stressed that "reference to [the agents] having a sniffing dog with them" would be omitted, and it in fact was.

We, however, have no problem with the propriety of the introduction of the foregoing testimony. In contrast to the other two categories of evidence, the purpose and effect of which was to implicate Salamone as being involved in some nefarious conspiracy, this testimony raises no inference of any connection between or scheme among Salamone and various other defendants in *Badalamenti*, and is directly relevant to an issue which the *Badalamenti* jury did not necessarily decide—whether Salamone in fact bought MACs in fictitious names.[24] Thus, we hold that it was proper-

---

**23.** The weapons that the agents testified they found had previously been identified as those which Salamone was alleged to have purchased. Moreover, expert testimony was introduced that the box of ammunition had Salamone's palm prints on it. Tr. 860–61.

**24.** A similar analysis was made in *United States v. Bollinger*, 796 F.2d 1394. There, one of the defendants (Hall) was acquitted of conspiracy to import cocaine, but the jury failed to reach a verdict on a substantive importation charge. The defendant objected to the introduction of certain evidence at his retrial on the substantive count that had been introduced in his first trial. The court first stated that the jury in the first trial necessarily decided that there was "insufficient evidence of agreement to support a con-

spiracy conviction." *Id.* at 1406. It went on to state:

> We recognize that substantial evidence produced at the first trial was also admitted at the second.... Contrary to Hall's assertions, however, this evidence was 'not *necessarily* rejected by the first jury. While it is all relevant to the conspiracy of which Hall was acquitted, it does not go to the particular element—agreement—that the jury must have found lacking. Rather, the evidence is relevant to Hall's participation in the actual importation. As this element was not decided in his favor at the first trial, Hall's conviction is not due to be overturned on collateral estoppel grounds.

*Id.* at 1406–07.

ly admitted. *See Pappas.*[25]

We also note the following with respect to an issue suggested by the facts but not raised on appeal. The government concedes that the same activity, acquisition of firearms, gave rise to both Salamone's trial in New York on conspiracy charges[26] and his separate trial in Pennsylvania on the substantive firearm counts (Brief at 17, 19). This presents a question as to whether Salamone was subjected to separate or multiple prosecutions for the same activity/offense in violation of the Double Jeopardy Clause of the Fifth Amendment. *See Brown v. Ohio,* 432 U.S. 161, 166–67 n. 6, 97 S.Ct. 2221, 2226 n. 6, 53 L.Ed.2d 187 (1966); *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (per curiam); *In re Nielsen,* 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889). On appeal, Salamone relied exclusively on the collateral estoppel aspect of double jeopardy. *See Ashe v. Swenson,* 397 U.S. at 437–40, 90 S.Ct. at 1191–92. Therefore, collateral estoppel is the only aspect of double jeopardy with which we deal.

In summary, we must reverse Salamone's conviction on counts four, five and six, and remand to the district court for a new trial and further proceedings. We will, however, not disturb his conviction on counts one and two.

With respect to the remand, we point out that if the government elects not to retry Salamone or if he is retried but acquitted on one or more of the counts retried, he may be resentenced on counts one and two, *e.g., United States v. Sebetich,* 776 F.2d 412, 415 & n. 2 (3d Cir.1985), *cert. denied,* — U.S. ——, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988). Thus, if he is to be retried, he should not be resentenced on counts one and two until after the retrial.[27]

The convictions and sentences on counts one and two will be affirmed and the convictions and sentences on counts four, five and six will be vacated. The matter will be remanded to the district court for further proceedings consistent with this opinion.

---

**25.** To the extent that Salamone objects to testimony by Renninger tending to establish that Salamone purchased the MACs at issue here on the ground that Renninger gave similar testimony in *Badalamenti,* we reject his argument for the same reasons.

**26.** In New York, it was alleged that acquisition of the firearms, in addition to money laundering, was performed in furtherance of a drug trafficking conspiracy and racketeering enterprise.

**27.** Because we will remand for resentencing, we need not address Salamone's objections to the sentence imposed.