**UNITED STATES of America, Appellee,**

v.

**Lorenzo DELGADO FIGUEROA, Defendant, Appellant.**

**No. 86–1856.**

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1987.

Decided Nov. 5, 1987.

Jose Hernandez Sosa with whom Francisco M. Lopez Romo, San Juan, P.R., was on brief, for appellant.

Salixto Medina Malave, Asst. U.S. Atty., with whom Jose A. Quiles, Acting U.S. Atty., Hato Rey, P.R., and Jorge L. Arroyo, Asst. U.S. Atty., Criminal Div., Old San Juan, P.R., were on brief, for appellee.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant Lorenzo Delgado Figueroa appeals his jury convictions on one count of conspiracy to commit mail fraud, 18 U.S.C. §§ 371, 1341, and four counts of aiding and abetting mail fraud, 18 U.S.C. § 2. The fraud involved arson and illegally obtaining the proceeds of a fire insurance policy. Appellant was a police officer assigned to investigate the fire on which the fraud was based. The only issue is the sufficiency of the evidence.

## I. THE FACTS

The standard of review is well established: "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of the fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

In this case, the controversy centers mainly on inferences to be drawn from the facts. In such a case, this circuit has stated:

One's belief in the strength of these inferences, even when taken together, depends, of course, upon the degree to which one shares certain common-sense notions about human behavior.... Reasonable people might have different views about the correct answers to these questions about human behavior. Our system, however, gives jurors, not judges, the responsibility for formulating such views and answering such questions. It does so, not because jurors have expert knowledge ... or because they have the 'true' answers, but rather because jurors are more likely than judges to come up with answers that reflect the commonsense view of the community. And, as case law makes

clear, we must accept the jury's answers unless unreasonable. Thus, we have said that the evidence need not preclude every reasonable hypothesis inconsistent with guilt; and we have added that the jury is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable.

*United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985), *cert. denied sub nom. Mosquero v. United States,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). With these precepts in mind, we turn to the evidence.

Juan Hernandez Roman owned Eleven International, Inc., a business which sold assorted dry goods on the wholesale market. Jose Manuel Martinez Machuca was the business' general manager and accountant. Hernandez lived in a two-story building: the first floor was the warehouse for Eleven International; the second was his family residence. On December 24, 1979, the building was burned down by Hernandez.[1]

The reasons for the arson stemmed mainly from Eleven International's declining viability. A competitor and former employee of Hernandez', Wilfredo Rivera Diaz, was able to undercut Eleven's prices because he received stolen goods from a group of thieves known as the Latorre Gang. Hernandez had dismissed Rivera as general manager of Eleven. Rivera went into business and became Hernandez' chief competitor. Because Caribbean International, Rivera's business, could sell goods at prices dramatically lower than Eleven, Eleven was losing much of its business. Hernandez had attempted to sell his business, but was unable to locate a buyer. And he had been unable to secure a line of credit from a bank.[2]

Prior to the arson, Hernandez and Martinez devised a plan to maximize the amount collected from Eleven International's insurer, Manufacturers Trust Insurance Company (MTIC). A detailed inventory was conducted. Because much of the inventory had already been sold, the value of the remaining goods was inflated. Hernandez arranged a secret pre-fire sale of much of the remaining inventory to one Valentino Colon.

The date of the fire, December 24, 1979, was chosen because of its proximity to the holidays. Hernandez arranged for himself and his family to visit relatives on Christmas Eve, hence the building was empty when he set the fire. The fire accomplished its purpose. It took eight hours to extinguish the flames, and everything in the warehouse was destroyed.

The fraud proceeded apace after the fire. The inventory was again marked up, this time to more than three times its value. A claim for over $350,000 was submitted to Benjamin Acosta, an independent adjustor working for MTIC. MTIC turned the investigation over to Hector Montalvo Rivera, director of Centro de Investigaciones del Caribe (CCI), a private investigation firm. Prior to working for CCI, Montalvo had been an officer with the Puerto Rico Police for eleven years, three of which were spent with the fire and explosives division. During part of this time, he had been appellant's supervisor.

The police investigation was originally assigned to Carlos Cardona Rivera, an officer new to such work. Cardona conducted only a preliminary investigation of the fire during the few days he worked on the case. Because of the size of the fire, Cardona's lack of experience and appellant's greater expertise with such cases, the investigation was reassigned to appellant.

In early January 1980, Montalvo and appellant went together to view the scene of the fire. They determined that the fire was not accidental. They then interviewed Hernandez, who attempted to throw suspicion on Rivera, his competitor. Through his police contacts, Montalvo was able to

---

1. Both Hernandez and Martinez testified pursuant to plea agreements.

2. Hernandez also testified that he set fire to the building because of shots fired at his home.

The shots were in response to Hernandez' reporting Rivera to the police after Hernandez received at his warehouse stolen goods intended for Rivera's warehouse.

meet with Rivera three times. During these meetings, Rivera told Montalvo that Hernandez had set the fire and that Hernandez had sold goods secretly before the fire. Montalvo relayed this information to appellant. Acting alone, Montalvo was able to verify Rivera's story about the pre-fire sale by obtaining copies of checks and invoices from Colon, who had purchased much of the pre-fire inventory. Montalvo informed appellant of this and showed him the material he had obtained.

Based on these leads, Montalvo centered his investigation on Hernandez. After three to four months of work and many interviews, Montalvo concluded that Hernandez had set the fire. Sometime in February or March 1980, Montalvo informed MTIC and appellant of his conclusion. He recommended that appellant proceed with criminal charges against Hernandez. Montalvo also prepared three reports on the fire; the last one was submitted in June 1980.

Appellant's investigation included one meeting with Rivera. At this meeting, Rivera loaned appellant $500; the loan was never repaid. Appellant met with Hernandez many times; it is fair to characterize most of the meetings as social. Montalvo was not present during any of the social meetings. Martinez, Hernandez' general manager and accountant, was present occasionally. Appellant and Hernandez also spent four days together in Santo Domingo. Hernandez paid appellant's hotel expenses. In order to go to Santo Domingo, appellant requested and received sick leave from the police department.

Prior to the Santo Domingo trip, appellant requested a $10,000 loan from Hernandez. Hernandez agreed to give appellant $5,000 immediately and $3,000 after he received the money from his insurance claim. Hernandez testified that the reason for giving appellant the money was to influence the investigation.

On March 17, 1980, appellant filed a report of his investigation. The report outlined the steps he had taken thus far and his basic conclusions, two of which are important:

It is understood that there was a criminal hand in the [fire] since it was not caused by short circuit and at the time when it ocurred [sic] it is presumed that nobody was in said warehouse.

. . . .

[Hernandez] has also been investigated regarding his credit in the Banco Popular and the same resulted good, the business was not in bankruptcy, nevertheless these angles were investigated and to the moment it is not known who was the person that caused the fire in the business.

The report did not mention any of the information appellant had received from Montalvo, the private investigator.

Because Hernandez did not know that appellant had filed this report, he arranged, through other police officers he knew, to have the case reassigned. More money was paid by Hernandez to the police and a final report was filed in April 1980. The police officers involved in this part of the scheme were named unindicted coconspirators.

Based on the police investigation reports, Hernandez sued MTIC for $300,000 on his insurance claim and obtained $220,000 by way of settlement. One of the reasons that prompted MTIC to settle was because appellant's report did not state that Hernandez was suspected of setting the fire.

Appellant's testimony contradicted most of the unfavorable evidence set forth above. He denied receiving money from Rivera or Hernandez; he denied having any of his expenses paid by Hernandez while in Santo Domingo; he denied slanting his report so as to deflect suspicion from Hernandez.

## II. THE CONSPIRACY CHARGE

■ The necessary elements of a conspiracy charge have been stated by us as follows:

The gist of conspiracy is an agreement to disobey or to disregard the law. Two types of intent must be proven: intent to agree and intent to commit the substantive offense. *United States v. Flaherty,*

668 F.2d 566, 580 (1st Cir.1981). A conspiratorial agreement may be proven by circumstantial as well as direct evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "A common purpose and plan may be inferred from a development and a collocation of circumstances." *Id.; United States v. Peters*, 732 F.2d 1004, 1007 (1st Cir.1984). The government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence. Rather, "the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that defendant is guilty beyond a reasonable doubt." *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir.1964). *See also Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954).

*United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984). In *United States v. Alemany Rivera*, 781 F.2d 229, 234 (1st Cir.1985) (citation omitted), *cert. denied*, 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 125 (1986), we added the following gloss: "As *Drougas* makes clear, agreement and intent need not be proven by direct evidence; they may be inferred circumstantially. Furthermore, a conspiratorial agreement need not be express, but may consist of no more than a tacit understanding."

In the present case, the government did not seek to prove an express agreement by direct evidence; its case was based on circumstantial evidence coupled with the reasonable inferences to be drawn therefrom. Based on the following evidentiary summary, a reasonable jury could have found that appellant agreed with Hernandez to defraud MTIC:

1. From the earliest point in his investigation, appellant knew that the fire was not an accident.

2. Montalvo relayed to appellant facts which strongly suggested Hernandez' involvement in the arson, including evidence in the form of checks and invoices of the pre-fire sale.

3. Appellant did not follow up on Montalvo's leads.

4. Appellant and Hernandez developed a friendship and met unofficially numerous times while appellant was investigating the fire.

5. Appellant asked for a loan of $10,-000 from Hernandez. He received $5,000 from Hernandez, along with a promise of $3,000 more *after* Hernandez received his insurance money. Thus, appellant had a stake in the outcome of the investigation.

6. Appellant received hotel expenses from Hernandez while in Santo Domingo with Hernandez.

7. Appellant's report concerning the fire states that "a criminal hand" was at work, but, no reference is made to Hernandez' suspicious activities or Montalvo's findings.

8. As an experienced arson investigator, appellant should have known that his report would be used by Hernandez to obtain the insurance money and that the mails would be used for such purpose.

"[T]he preceding [eight] sets of [facts and] inferences are mutually reinforcing, or at least mutually consistent. Thus, a juror might have reasoned that all of them, taken together, remove a reasonable doubt." *Guerrero–Guerrero*, 776 F.2d at 1015.

Appellant argues strenuously that the first quoted paragraph of his report shows his innocence because he reported that the fire was the work of "a criminal hand." A reasonable jury, however, could have inferred that appellant had no choice but to state that the fire was intentional because of the investigative work and reports by Montalvo. Furthermore, a reasonable jury could also have inferred that appellant's vague reference to "a criminal hand" was intended to deflect suspicion away from Hernandez. This second inference would be based on: (1) the limited facts set forth in the report; (2) the failure of the report to mention the investigation and conclusions of the private investigator, Montalvo; and (3) the paragraph in the report stating that Hernandez had a good credit rating, was not in bankruptcy, and that the person

who set the fire was unknown. As we said in *United States v. Alemany Rivera,* 781 F.2d at 234: "In short, the jury could have found that [appellant's] conclusions concerning his actions were squarely at odds with his actions themselves."

There was sufficient evidence for a jury to find beyond a reasonable doubt that appellant had conspired with Hernandez to obtain insurance proceeds from a fire that Hernandez had deliberately set.

## III. AIDING AND ABETTING

■ In comparison to conspiracy, which requires an intent to agree to commit the substantive offense, aiding and abetting requires

> that a defendant in some way "associate himself with the venture, that he participate in it as in something he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.), *quoted in Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919, 925 (1949). Participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result. *Id.*

*United States v. Hathaway,* 534 F.2d 386, 399 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). *See also United States v. Albert,* 773 F.2d 386, 390 (1st Cir.1985); *United States v. Quejada–Zurique,* 708 F.2d 857, 859 (1st Cir.), *cert. denied sub nom. Morejon–Ortega v. United States,* 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983); *United States v. Tarr,* 589 F.2d 55, 59 (1st Cir.1978). We recognize, of course, that "[m]ere presence at the scene and knowledge that a crime is being committed is generally insufficient to establish aiding and abetting." *United States v. Campa,* 679 F.2d 1006, 1010 (1st Cir.1982).

As with the conspiracy, the government relied on circumstantial evidence. The evidence outlined in the Conspiracy section is equally applicable here. Of particular relevance is appellant's friendship with Her-

nandez, his conditional loan from Hernandez, and his trip with Hernandez to Santo Domingo, each of which points toward appellant's association with the venture. Appellant's investigative report and his failure to follow up Montalvo's leads show his active participation in making the scheme a success.

Appellant's reliance on his contradictory testimony to cast a reasonable doubt on the evidence against him—and on other inconsistencies among the testimony of other witnesses—is misplaced. On appeal, this court must assume that the jury resolved these inconsistencies against appellant. Furthermore, the jury was free to disbelieve appellant's story. "If the jury disbelieved the defendant['s] story, it could have concluded that the fabrication was all the more evidence of consciousness of guilt." *United States v. Quejada–Zurique,* 708 F.2d at 861 (citation omitted).

There was sufficient evidence presented for a jury to find that the government proved each of the elements of aiding and abetting beyond a reasonable doubt.

## IV. INTENT TO COMMIT MAIL FRAUD

■ Appellant also contends that the government did not show "that the defendant had the specific intent to violate the U.S. Mail Statute." Appellant's Brief at 33. He appears to argue that he is blameless because he was not aware that Hernandez would complete the fraud by violating the mail fraud statute. This is a misstatement of the proof required when mail fraud is alleged, much less when conspiracy to commit or aiding and abetting the commission of mail fraud is alleged.

> It is settled law that an accused causes a letter to be delivered by mail where he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where he could reasonably foresee that the use of the mails would result. It is not necessary to prove that the accused ... actually intended that the mail be used.

*United States v. Contenti,* 735 F.2d 628, 631 (1st Cir.1984) (citation omitted). *See also United States v. Fermin Castillo,* 829 F.2d 1194, 1197–99 (1st Cir.1987).

On this issue, a reasonable jury could have found the following facts and made the following inferences. Appellant was an experienced arson investigator. He knew that the fire was set intentionally and, based on Montalvo's findings, should have been suspicious of Hernandez. Appellant also knew that if Hernandez had set the fire, he would not be entitled to collect on the insurance policy. When appellant submitted his report, he knew that Hernandez would be able to proceed with his claim. Thus, appellant knew that Hernandez would be in a position to defraud MTIC—indeed, appellant wanted the fraud to succeed because of his conditional loan. Based on appellant's experience, it would have been reasonable for him to "foresee that the use of the mails would result." This was sufficient; the government did not have to show that appellant "actually intended that the mail be used."

## V. FINAL POINTS

■ Appellant states that "[t]he last overt act alleged against defendant Delgado was a Supplemental Police Report he submitted on March 17, 1980, which contained his investigation of this arson...." Appellant's Brief at 11. He then notes that the mailings did not occur until July and August 1980 and that a final police report intervened between these events. These allusions, which are not fully developed in appellant's brief, appear to be an attempt by appellant to claim that he did not further the actual substantive crimes alleged—the use of the mails to commit a fraud. This argument must fail since appellant participated in the only part of the venture in which his actions were needed—he wrote a report which formed the partial basis for MTIC's willingness to settle the claim. We recognize that partial participation is not enough; it must also be shown that appellant knew and intended to bring about the result. *Hathaway,* 534

F.2d at 399. This second requirement has been dealt with fully in section IV.

■ Appellant also argues that he has been found guilty by association—association with Hernandez and Martinez, and association with the corrupt officers who caused the final police report to be filed. This argument is without merit. Appellant admitted his friendship with Hernandez. As already noted, the jury could reasonably have found they were coconspirators. As for the link between appellant and the other officers, the government did not rely on this factor to prove its case. Based on the facts listed in the Conspiracy section, the jury could have found that Fate did not trap appellant—a hapless bystander in the wrong place at the wrong time—in its web; but rather, that appellant helped to weave a web designed to trap MTIC.

"In sum, the government established more than mere presence. This is not a case where, on the basis of association alone, the jurors were asked 'to let their imaginations run rampant.'" *United States v. Quejada–Zurique,* 708 F.2d at 861 (citation omitted).

Appellant's arguments are smokescreens without fire.

*Affirmed.*