UNITED STATES of America, Appellee,

v.

Richard M. DRAY,
Defendant, Appellant.

No. 89–1024.

United States Court of Appeals,
First Circuit.

Heard Jan. 12, 1990.

Decided March 28, 1990.

Opinion on Denial of Rehearing
April 20, 1990.

William P. Homans, Jr., with whom Homans, Hamilton & Dahmen, Boston, Mass., was on brief, for defendant, appellant.

F. Dennis Saylor, IV, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for the U.S.

Before SELYA, ALDRICH and CYR, Circuit Judges.

SELYA, Circuit Judge.

Like a phoenix, this case arises for a second time, but with all the ascendant vigor of its first incarnation. And, like its legendary avine counterpart, this bird, too, turns to ashes. The tale follows.

## I. BACKGROUND

In February 1987, defendant-appellant Richard Dray, along with Paul Ochs, was convicted of conspiracy to commit mail fraud. 18 U.S.C. §§ 371, 1341 (1982). At the same trial, Dray and Ochs were acquitted on five substantive mail fraud counts. In the aftermath of the Court's opinion in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), we vacated the convictions and remanded for retrial of the conspiracy count. *See United States v. Ochs*, 842 F.2d 515 (1st Cir. 1988). At the new trial, the defendants were again convicted on the conspiracy charge. Dray appeals, giving wing to several new arguments and necessitating that we revisit the matter from quite a different direction.

### A

We recount the facts necessary to an understanding of this appeal in the light most congenial to the prosecution, as precedent requires, *see, e.g., United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), referring the motivated reader to our earlier opinion for a more

exegetic narration. *See Ochs*, 842 F.2d at 517–19.

This prosecution arose out of the renovation of the Kresge Building in downtown Boston by Temple Place Associates (TPA), a Philadelphia-based limited partnership. TPA contracted with a local firm, Stanhope Development Company (Stanhope), to represent it and oversee the rehabilitation. Stanhope, like TPA, was formed exclusively for the Kresge project. One of Stanhope's duties was to assist in obtaining municipal permits. Mirabassi Associates, Inc. (Mirabassi), the general contractor and construction manager, was obligated to pay the fees for such permits. Ochs was a Stanhope partner. At his urging, TPA hired Dray, a well-connected Boston attorney, to handle permit-related legal matters.

Among his other attributes, Dray had known Douglas Robinson, an official of the city's Department of Inspectional Services, for some fifteen years. Ochs and Dray planned to bribe Robinson so that he would place the city's imprimatur upon a fraudulent application containing a gross understatement of project-related costs. Because the construction permit fee was calculated according to such estimates, "lowballing" the costs would effectuate a savings.

The evidence showed that Mirabassi calculated the real cost of the work to be $2,425,000. If submitted to the city, that estimate would have produced a permit fee of $23,950. When a Mirabassi engineer told Dray that the application was ready, Dray replied that the price tag was too grand. Dray directed that an application be prepared which falsely reflected $1,200,000 as the projected cost. Dray delivered the fraudulent application; Robinson processed and approved it. Because of the arithmetical fiction, the permit fee was reduced to $11,750. Mirabassi paid this bargain price and received the *nihil obstat.*

Of course, these machinations resulted in a windfall to Mirabassi—but the wind did not blow in that direction for long. To capture it, Dray and Ochs breezily embarked on a program of creative invoicing. First, Dray billed TPA $1,687.50 for conferring with Ochs and preparing and filing the permit application. Ochs transmitted this bill to TPA, which paid it. The next day, Dray billed Mirabassi $5,975 (roughly half the savings) for preparing and filing the same permit application. Although Mirabassi had not retained Dray and was not contractually bound to honor his invoice, Ochs hand-delivered it and directed Mirabassi to effect payment. Presumably because Mirabassi, having saved over $12,000, was well ahead of the game financially, it made the requested payment. In short order, Dray wrote a check to Ochs for $3,000 and gave Robinson approximately $400 in cash.[1]

Not content with the profit in hand, appellant sent another bill to TPA almost a year later. This statement asked $30,000 for legal services, again including the permit-related work. When Ochs protested, for TPA, that the charges were inordinate, Dray wrote back reminding him of the importance of Dray's political connections to the rehabilitation project. Ochs convinced TPA to pay the full $30,000.

## B

A federal grand jury thereafter handed up a six count indictment against Dray and Ochs. Count 1 charged the defendants with conspiring to use the mails in furtherance of a scheme to defraud the city, Mirabassi, and TPA. The remaining counts charged them with substantive violations of the mail fraud statute, 18 U.S.C. § 1341. When trial began, the government introduced evidence of where the contracting parties were located (Boston and Philadelphia) and showed that the mails were frequently used to transmit papers between them. The government also introduced seven specific documents which paralleled the five substantive offenses charged in

---

1. Although Robinson was supposed to receive one-sixth of the amount euchred from the city (roughly, a $2,000 share), Dray never gave him any more money on account of these shenanigans. Honor, even among thieves, may all too often be, in the bard's phrase, "a mere scutcheon." W. Shakespeare, *Henry IV Part I,* act V, sc. 1 (1598).

the indictment (two documents related to count 4 and two to count 6). These papers were introduced through J.W. Smith, a ranking TPA employee. According to Smith, it was the customary practice of TPA and Mirabassi to send written materials back and forth either by mail or Federal Express, depending on time constraints. Smith could not recall specifically whether the seven documents in question were mailed or transmitted in some other fashion. The government attempted to fill this gap by resort to circumstantial evidence. For instance, by comparing a document's internal date with the date of its apparent receipt, one might infer whether it had been mailed or had been delivered overnight. The rest of the prosecution's case was rock solid; turned sovereign's evidence under a grant of immunity, Robinson was the star witness.

While Federal Express is a useful intercommunicative device when celerity enters into the equation, *cf., e.g., United States v. LaFrance*, 879 F.2d 1, 2 (1st Cir.1989) (discussing service's utility "[w]hen contraband absolutely, positively has to get there overnight"), it is a form of delivery which falls beyond the reach of the federal mail fraud statutes. *See United States v. Massey*, 827 F.2d 995, 1000 (5th Cir.1987); *United States v. Wosepka*, 757 F.2d 1006, 1010 (9th Cir.1985). At the close of the case in chief, the district court (Woodlock, J.), while acknowledging "a possibility that the mails were used," ruled that the proof of mailing as to three specific offense counts was too exiguous to warrant consideration by the jury. The court stressed the likelihood that "Federal Express was used" for some (or all) of the materials transmitted. Accordingly, judgments of acquittal were directed as to counts 2, 3, and 5. The case went to the jury on the remaining charges (conspiracy, count 1; and two specific offenses, counts 4 and 6). The jury convicted both defendants of conspiracy, but otherwise acquitted them.

While the defendants' appeals were pending, the Supreme Court ruled that the mail fraud statute did not extend to deprivations of intangible rights. *McNally*, 483 U.S. at 356, 107 S.Ct. at 2879–80. Because Judge Woodlock, in full accord with prior precedent, had instructed the jury on several alternative theories of mail fraud, including the theory that mail fraud could encompass a scheme to defraud the public of an "intangible political or civil right," we overturned the convictions and remanded for a new trial. *See Ochs*, 842 F.2d at 521–27.

### C

Dray and Ochs were retried before a different judge (Mazzone, J.) under a redacted indictment limited to the conspiracy count. Before trial, Dray filed a motion in limine to bar reference to either the seven documents or the mailing thereof.[2] He argued that because those documents comprised the evidence against him on the mail fraud charges of which he stood acquitted, principles of collateral estoppel precluded their use at the conspiracy count's retrial. The district court denied the motion, ruling that the documents themselves, and the associated evidence, could be introduced. The judge simultaneously rebuffed appellant's request for limiting instructions.

At the second trial, substantially the same testimony emerged as at the earlier trial. The seven documents were again admitted as full exhibits. After unsuccessfully moving for judgment of acquittal, Dray was found guilty (as was Ochs). It is against this backdrop that we view Dray's legal arguments, referring from time to time, for ease in reference, to the earlier trial as "Trial No. 1" and to the replay as "Trial No. 2."

### II. PRINCIPLES OF COLLATERAL ESTOPPEL

Collateral estoppel is not only a principle of substantive federal law. In the criminal context, it is imbued with constitutional dimensions. *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d

---

**2.** We set forth as an appendix to this opinion a table outlining the documents; their exhibit numbers at each trial; their relationship to specific offenses; and a thumbnail sketch of their contents.

469 (1970); *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 584 (1st Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). In certain respects, the doctrine stands as a sentinel safeguarding the Double Jeopardy Clause of the fifth amendment.

We are fortunate that on the eve of oral argument herein the Court restated its views on collateral estoppel in *Dowling v. United States,* — U.S. —, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). *Dowling* involved a prosecution for bank robbery. Although defendant had been acquitted of burglary in an earlier case, the district court allowed the victim to identify defendant as the man who entered her apartment during the burglary. The rationale for admitting the testimony was to buttress an identification of defendant as the bank robber; the perpetrator in both cases wore a ski mask and carried a small pistol. *Id.* 110 S.Ct. at 670. The Supreme Court held the evidence admissible under Fed.R.Evid. 404(b). *Id.* at 672. Because the threshold standard of proof was lower under that Rule than for a criminal conviction itself, the Court found "the collateral estoppel component of the Double Jeopardy Clause ... inapposite." *Id.* The jury might reasonably conclude that the same man was involved in both cases, even if it did not believe beyond a reasonable doubt that defendant had committed burglary. *Id.* The Court emphatically rejected the notion that "collateral estoppel in all circumstances bars the later use of evidence relating to prior conduct which the government failed to prove violated a criminal law," *id.* at 673, and explicitly declined:

> to extend *Ashe v. Swenson* and the collateral estoppel component of the Double Jeopardy Clause to exclude in all circumstances ... relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted.

*Id.* 110 S.Ct. at 672. In practice, then, because the prior burglary acquittal did not actually determine an ultimate issue presented in the bank robbery case, reuse of the evidence was appropriate. *Id.* And

in terms of broader implications, *Dowling* signalled that, even as between the same parties, only those issues actually decided in the earlier case are foreclosed from relitigation in a later case. Preexisting caselaw in this circuit is fully consistent with the driving principle which powers the *Dowling* rationale. *See, e.g., Gonzalez–Sanchez,* 825 F.2d at 584; *United States v. DeVincent,* 632 F.2d 147, 154 (1st Cir.), *cert. denied,* 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980).

■■ Narrowing the lens of inquiry, it seems clear in light of *Dowling* that if an issue determined in a prior proceeding between the same parties (or their privies) constitutes a necessary element of a subsequent prosecution, collateral estoppel will likely operate as a complete bar to the latter prosecution; otherwise, the doctrine at most may forestall the presentation of particular evidence and arguments. *See United States v. Ricks,* 882 F.2d 885, 889 (4th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990). Where it is impossible to discern whether a particular issue was previously resolved in a defendant's favor, preclusive effect must be denied. *See, e.g., Gonzalez–Sanchez,* 825 F.2d at 583–84 (evidence of prior crime admissible at later trial, notwithstanding earlier acquittal, to prove "a fact that was not necessarily decided by the jury in reaching its verdict"); *United States v. Ranney,* 719 F.2d 1183, 1187 (1st Cir.1983) (collateral estoppel "inappropriate [where] the jury most likely grounded its verdict on an issue other than the one which defendants seek to foreclose"); *DeVincent,* 632 F.2d at 154 (same); *see also United States v. Rodriguez–Estrada,* 877 F.2d 153, 157 (1st Cir.1989) (collateral estoppel "has long been thought inoperative as to 'evidentiary or mediate facts' ") (quoting *Yates v. United States,* 354 U.S. 298, 338, 77 S.Ct. 1064, 1087, 1 L.Ed.2d 1356 (1957)).

The task of separating evidentiary wheat from collaterally estopped chaff in a case where a previous judgment of acquittal was based upon a general verdict follows a well-established protocol. The reviewing tribunal must "examine the record of [the]

prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194; *see also Dowling,* 110 S.Ct. at 673 (reaffirming *Ashe* approach); *cf. Rodriguez-Estrada,* 877 F.2d at 157 (comparing evidence, findings, and issues between earlier civil and later criminal trials). In conducting this review, we must be "practical" and not too "technically restrictive," *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194, remaining mindful of the totality of the circumstances. *See Dowling,* 110 S.Ct. at 673; *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194. In the last analysis, the burden is on defendant "to demonstrate that the issue whose relitigation he seeks to foreclose was *actually* decided in the first proceeding." *Dowling,* 110 S.Ct. at 673 (emphasis supplied).

## III. APPLICATION OF COLLATERAL ESTOPPEL PRINCIPLES

■ As we have shown, criminal collateral estoppel involves a brace of inquiries: (1) Has defendant demonstrated that an ultimate issue of fact was actually decided in his favor at the first proceeding? (2) If so, would defendant be required to relitigate the same issue at the retrial? In posing the questions here, ease in exposition demands that we treat separately those papers which were the subject of Judge Woodlock's direction for acquittal and those which were the subject of the jury's general verdicts.

### A

Appellant argues that the judicially directed acquittals on counts 2, 3, and 5 of the unredacted indictment determined an ultimate fact—the absence of mailing—in his favor. Pyramiding on this supposition, he asserts that the documents' reintroduction at his second trial was foreclosed. Dray's analysis, however, is much too superficial.

■ Counts 2 through 6 of the indictment charged substantive mail fraud, whereas count 1 charged conspiracy to commit mail fraud. These are distinct crimes having distinct elements. The critical difference for our purposes is that substantive mail fraud requires a showing that the mails were actually used to further the scheme or artifice. *See United States v. Silvano,* 812 F.2d 754, 760 (1st Cir.1987); *United States v. Contenti,* 735 F.2d 628, 631 (1st Cir.1984). Mail-fraud conspiracy, on the other hand, necessitates only that the prosecution show intent to use the mails or show that such use was reasonably foreseeable. *See United States v. Delgado Figueroa,* 832 F.2d 691, 697 (1st Cir.1987); *Silvano,* 812 F.2d at 760. In contemplation of law, there is a chasmal gulf between what is "actual" versus what is "intended" or "reasonably foreseeable." That the evidence needed to prove these separate elements may often overlap, or may (as here) be identical, cannot eradicate this important distinction.

■ As to the three counts presently under consideration, Judge Woodlock's bench decision granting defendants' Fed.R. Crim.P. 29(a) motion obviates any need to guess at the basis for acquittal. *See United States v. Pappas,* 445 F.2d 1194, 1197–98 (3d Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971). It is transparently clear that the judge determined only that there was insufficient evidence from which a jury could conclude beyond reasonable doubt that the three documents in question (exhibits 13–15 in Trial No. 1; exhibits 32–34 in Trial No. 2) had actually been mailed. Nothing in his ruling suggests that Judge Woodlock believed, or found, that mailing was not intended or reasonably foreseeable. Indeed, that the judge denied Rule 29(a) motions addressed to the conspiracy count at Trial No. 1, and did not strike the documents in question or limit the jury's use of them, suggests exactly the opposite. Hence, it remained open to the government to relitigate the issues of intent to mail and reasonable foreseeability at Trial No. 2 and to use the challenged evidence to that end.

Defendant argues for a contrary result, relying principally upon *United States v. Salamone*, 869 F.2d 221 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 246, 107 L.Ed.2d 196 (1989). In *Salamone*, the Third Circuit wrote:

> [W]here a jury's acquittal of a defendant in a first prosecution necessarily was grounded upon its resolution of a particular issue, reprosecution is constitutionally barred where redetermination of the issue would be essential to the defendant's conviction, and ... the government is collaterally estopped from relitigating the issue even if a contrary resolution is *not* necessary to convict the defendant, but simply would constitute evidence against him or her.

*Id.* at 226. While this language, in isolation, offers beguiling comfort to appellant, giving context to the words dispels the illusion. In *Salamone*, the court held that, at defendant's later trial on firearms charges, certain evidence of his association with reputed gangsters was inadmissible because, at his earlier trial, the jury had acquitted him of membership in a conspiracy involving those persons. *Id.* at 231. For purposes of the second trial, the "inescapable implication" of the associational evidence was that Salamone acquired the weapons "pursuant to his connection with [those] individuals" and that "there was some sort of nefarious conspiracy" between them. *Id.* Because this theory was, as a practical matter, identical to the claim the first jury had definitively rebuffed, the evidence—concededly not relevant in any other way—was inadmissible; it was being introduced *for the same purpose* at a later trial after the original factfinder had flatly "reject[ed]" an inference from this testimony essentially indistinguishable from that the one the government desired the [second] jury to draw." *Id.*

The case at bar is at a considerable remove from *Salamone*. Here, the government sought to have the jury at Trial No. 2 draw an inference that the mailing of exhibits 32–34 was reasonably foreseeable—an inference entirely separate, and easily distinguishable, from the "actual mailing" inference rejected by the judge at Trial No. 1. Under the prevailing view of collateral estoppel, the government cannot be barred, *ipso facto*, from using evidence merely because the same evidence was used in an earlier (unsuccessful) prosecution. *See United States v. Price*, 750 F.2d 363, 365–66 (5th Cir.) (overlapping evidence may permissibly be reintroduced so long as relevant to more than prior acquitted crime), *cert. denied*, 473 U.S. 904, 105 S.Ct. 3526, 87 L.Ed.2d 651 (1985); *DeVincent*, 632 F.2d at 154 (similar). The key to reuse is independent significance: does the proof bear on an issue (or issues) materially different from those actually determined at the former trial? *Salamone* recognized and accepted this very principle, reaffirming the government's entitlement to introduce evidence establishing the crimes charged at the second trial "even though the evidence paralleled evidence introduced in" the first trial. 869 F.2d at 229. Thus, although the documentary evidence offered at Trial No. 2 overlapped with the evidence of actual mailing presented at Trial No. 1, reintroduction was permissible because of the evidence's relevance to issues wholly distinct from any issue theretofore decided in appellant's favor.[3] *See id.* at 228–29; *Ranney*, 719 F.2d at 1186–87; *DeVincent*, 632 F.2d at 154.

In a nutshell, Trial No. 1 conclusively determined the government's inability to

---

**3.** Appellant's reliance on *Gonzalez–Sanchez* for a divergent result is likewise mislaid. To be sure, we wrote there, by way of dicta, that "evidence of a prior crime for which defendant was acquitted is inadmissible in a later trial, *unless the evidence goes merely to a collateral fact ... that was not necessarily decided by the [first] jury in reaching its verdict.*" 825 F.2d at 583–84 (emphasis supplied). But, the government had "concede[d] ... that the [challenged] evidence was admitted in error," and our holding went to whether admitting the evidence was harmless beyond a reasonable doubt. *See id.* at 584. Moreover, *Gonzalez–Sanchez*, like *Dowling*, involved the admission at a later trial of evidence of a prior crime for which defendant had been acquitted, using Fed.R.Evid. 404(b) as a fulcrum. In light of *Dowling* (which, unlike the case at bar, dealt with collateral estoppel principles in a Rule 404(b) setting), we would certainly in a proper case reconsider the *Gonzalez–Sanchez* dicta. We have no occasion to do so today.

prove that the three documents in question were *actually* mailed. Retrial on the conspiracy charge did not compel appellant to relitigate whether these papers were mailed. Rather, the disputed evidence was allowed at Trial No. 2 in order to demonstrate the existence of a conspiracy and the coconspirators' reasonable foreseeability of mailing. Reintroduction of the three documents and Smith's rehashed testimony as to the parties' usual office practices was proper for these purposes. It follows, as night follows day, that because no issue determined in appellant's favor at his first trial was relitigated at the second, collateral estoppel did not bar use of the three exhibits.

**B**

■ We turn next to the jury's general acquittal on counts 4 and 6 of the unredacted indictment. Dray asseverates that the verdicts necessarily signalled a determination that no fraudulent scheme existed, or if one did, that he was not a willful participant therein, or that mailing of the documents upon which these counts depended (exhibits 16–19 in Trial No. 1; exhibits 35–38 in Trial No. 2) was not foreseeable. In appellant's view, the compactness of this list of options is enough to trigger a collateral estoppel bar.

We approach this inquiry conscious of the need to take into account the entire record of the proceedings. *See Dowling,* 110 S.Ct. at 673; *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194. At Trial No. 1, the jury did more than acquit Dray on counts 4 and 6; it also convicted him on count 1 (the conspiracy charge). Given these simultaneous and facilely reconcilable verdicts, appellant's account of the jury's factfinding becomes fanciful. The sockdolager is this: in order to have convicted appellant of conspiracy, the first jury must have found all the necessary elements of that crime, including the existence of a conspiracy and appellant's knowing and willful participation therein. Appellant's acquittal on the substantive counts cannot logically be attributed to a jury finding to the contrary.[4] The same sort of reasoning lays waste to Dray's claim that the first jury must have decided the issue of reasonable foreseeability. In respect to the specific offense counts, the jurors were told that they should acquit unless the government had proved actual mailing beyond reasonable doubt. Taking into account the conspiracy conviction, it seems highly probable, if not ineluctable, that the original jury found insufficient evidence that the exhibits in question were actually mailed, but sufficient evidence that mailing was contemplated.[5]

Notwithstanding questions from the first jury during its deliberations, the possibility of jury compromise does not alter our conclusion. After all, appellant's conspiracy conviction at the first trial "indicates that the jury found the relevant facts adversely to [him], notwithstanding the acquittals on other related counts ...; the conviction casts doubt on whatever factual findings might otherwise be inferred from the related acquittal[s]." *United States v. Citron,* 853 F.2d 1055, 1059 (2d Cir.1988) (citations omitted); *cf. Price,* 750 F.2d at 366 (similar; discussing inconsistent verdicts).

On any fairminded view of the overall record, then, we are left with a choice among a variety of plausible theories as to what ultimate factual issues were actually

---

**4.** It is similarly implausible to posit that appellant's conviction rested on a conclusion that Ochs committed the two overt acts of mailing; Judge Woodlock specifically instructed the jury that "[e]ach defendant is entitled to have his guilt or innocence ... determined from the evidence which applies to him as if he were being tried alone."

**5.** There is another possible scenario equally devastating to Dray's position. The four exhibits all bore upon appellant's climactic $30,000 bill to TPA, sent nearly a year after the building permit was obtained and certain spoils divided. Hence, the first jury could have found that the scheme between Dray and Ochs was completed when TPA and Mirabassi paid the initial round of invoices—events which occurred many *months before the wrangling over the* $30,000 bill took place. On that hypothesis, the acquittals on counts 4 and 6 might well have meant no more than that the jury believed the four exhibits were not mailed "in furtherance of" the conspiracy.

decided by the jury at Trial No. 1. The probabilities veer sharply away from the self-serving conclusion which appellant would have us read into the jury's verdict. Gossamer strands of possibility and surmise are not the stuff of which the preclusory bar of criminal collateral estoppel may be fashioned. Sturdier threads are needed. On this gauzy record, Dray cannot meet his burden of demonstrating "that the issue whose relitigation he seeks to foreclose was *actually* decided in the first proceeding." *Dowling*, 110 S.Ct. at 673 (emphasis supplied); *see also Ashe*, 397 U.S. at 444, 90 S.Ct. at 1194; *Gonzalez–Sanchez*, 825 F.2d at 583–84; *Ranney*, 719 F.2d at 1187.

### C

■ Appellant, vigorously represented by able counsel, has one more string to his collateral estoppel bow. He asserts that this case is "different" because Judge Woodlock's jury instructions on substantive mail fraud frankly invite the conclusion that the acquittals meant mailing was not reasonably foreseeable.[6] This thesis posits that the judge's charge made reasonable foreseeability a "sub-element" of actual mailing, so that, "more probably than not," the acquittals were based on insufficient evidence as to foreseeability. The assertion is more cry than wool. We explain briefly.

By their own terms, the instructions were not given on the issue of mailing, but explicated the government's burden as to criminal intent. The instructions recognized, appropriately, that the same evidence might support findings that Dray both intended a mailing to occur and

caused one to occur. We are nevertheless at a loss to understand how or why the jury was constrained by the instructions to draw both inferences, or neither. It remains altogether plausible that Dray specifically intended that mailings were to occur (and that the jury so found), but that this intent was frustrated in some fashion (say, by the fortuitous use of Federal Express). If the evidence was insufficient to prove beyond a reasonable doubt that the documents were in fact mailed, the jury could then consistently acquit appellant of mail fraud, yet convict him of conspiracy, finding the requisite foreseeability.

There was no error in the admission of the disputed evidence during Trial No. 2. Collateral estoppel was not a bar to its reutilization.

## IV. NEED FOR LIMITING INSTRUCTIONS

■ In a related vein, Dray contends that Judge Mazzone erred by failing to restrict the use of the admitted documents at the second trial. The facts are these. When the judge denied Dray's motion in limine, the defense requested that admission of the documents be limited.[7] Two proposals were advanced. Dray's primary idea was that the documents should be received only on the issue of whether a conspiracy existed, and not for determining whether it was reasonably foreseeable that they would be mailed; on this thesis, the jury was to be specifically instructed that the documents had been not mailed. As an alternative, Dray asked that the evidence be limited to the issue of reasonable foreseeability. Judge Mazzone adopted neither

---

6. The judge charged in relevant part:
    The Government must prove not only that the alleged mailing actually occurred, but also that the defendant specifically intended that such a mailing occur. In meeting this burden, it is not necessary for the defendant to be directly or personally involved in a mailing as long as the mailing is reasonably foreseeable in the execution of the alleged scheme to defraud in which the defendant was accused of participating.
    .... When one does an act with the knowledge that the use of the mails will follow in the ordinary course of business or where such use of the mails can reasonably be foreseen,

even though not precisely contemplated in that instance, then he can be found to have caused and specifically intended the mails to be used.

7. The request implicated Rule 105, which provides:
    When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.
    Fed.R.Evid. 105.

suggestion. According to appellant, the court's recalcitrance left open the possibility that the jury might decide that some or all of the documents had in fact been mailed, thereby running afoul of the verdicts previously returned.

We review the denial of limiting instructions solely for abuse of discretion. On this basis, we see no error. Having reminded the jury twice that this case was not about substantive mail fraud, but conspiracy, Judge Mazzone painstakingly explained the difference. He told the jury, in so many words, that mailing was *not* the issue. The jurors' task at Trial No. 2 was to determine whether the government had proved that there was "a conspiracy to devise a scheme to defraud ... in which it was reasonably foreseeable that the mail would be used." Viewed in this light, restriction of the evidence by informing the jurors that they could not consider the exhibits as proof of actual mailing would have been redundant. Having made clear by explicit and exacting instructions that actual mailing was not an issue in the case, it was unnecessary—and would have been confusing—to tell the jury not to consider the documents on that (non)issue. And, there was no reason to restrict the admission of the documents solely to the issue of reasonable foreseeability; as Judge Mazzone ruled, they were also relevant to the existence of the conspiracy charged in the indictment.

Appellant argues that *Dowling* required the district court to frame some limiting instruction. We do not read *Dowling*, 110 S.Ct. at 671, 674, as requiring such an instruction except, perhaps, where evidence is admitted under Fed.R.Evid. 404(b). In such circumstances, whether or not collateral estoppel concerns are present, limiting instructions are commonly used and serve a prophylactic purpose. *See, e.g., Huddle-*

ston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988); *United States v. Ingraham*, 832 F.2d 229, 234 (1st Cir.1987) (discussing value of limiting instructions as to Rule 404(b) evidence), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *see also Dowling*, 110 S.Ct. at 674. In a case like this one, where the proffer was not admitted pursuant to Rule 404(b) but furnished independent evidence of the precise crime charged in the indictment, limiting instructions were not obligatory, Rule 105 notwithstanding. *See United States v. Martin*, 794 F.2d 1531, 1533 (11th Cir.1986); *United States v. Gallo*, 763 F.2d 1504, 1528 (6th Cir.), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1985). We discern neither legal error nor unfair prejudice in consequence of Judge Mazzone's refusal to restrict the jury's use of the evidence.

## V. THE McNALLY ARGUMENT

■ Shifting gears, appellant contends that the $12,200 "savings"—the difference between the fee due to Boston if the projected rehabilitation cost had been candidly disclosed and the fee actually paid on the basis of the apocryphal estimate—was not "money or property" within the meaning of 18 U.S.C. § 1341.[8] Rather, the city was deprived of "a mere unilateral expectation" that it would collect the larger fee. These mental gymnastics fall rather flat.

We have already indicated that the charges which remained after excising "intangible rights" from the indictment (lowballing and double billing) "both involve property deprivations and thus survive *McNally*." *Ochs*, 842 F.2d at 527; *see also United States v. Doherty*, 867 F.2d 47, 55 (1st Cir.) (applying *Ochs* ), *cert. denied*, —— U.S. ——, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989). That statement is thoroughly sup-

---

**8.** The statute provides in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or

thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [guilty of mail fraud].
18 U.S.C. § 1341 (1982).

ported by an examination of section 1341 jurisprudence. The mail fraud statute is limited to the protection of property rights, but the concept of property "is to be interpreted broadly." *McNally*, 483 U.S. at 356, 107 S.Ct. at 2879. Since *McNally*, section 1341's prohibitions have been read to reach schemes designed to deprive persons, and governments, of a wide array of interests. *See, e.g., Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) (deprivation of newspaper's interest in pre-publication confidentiality and exclusive use of contents); *Doherty*, 867 F.2d at 56 (scheme involving theft of police department promotional examinations); *see also United States v. Allard*, 864 F.2d 248, 251 (1st Cir.1989) (fraudulent procurement of medical license and subsequent, remunerated medical practice). Given this expansive interpretation of "money or property," Boston's loss (and appellant's corresponding gain) is easily accommodated within the statutory framework.

In this case, the permit fee was no mere unilateral expectation, as appellant exhorts, but a legal obligation. Where such fees are required, conspiracies to avoid paying them deprive the sovereign of a very concrete and tangible kind of property—cash. We think it obvious that a governmental agency is deprived of "money or property" when persons attempt to evade, or divert, the payment of legally required fees and taxes. Other courts apparently agree. *See, e.g., United States v. Gelb*, 881 F.2d 1155, 1162 (2d Cir.) (scheme to defraud Postal Service of revenue from mass mailings), *cert. denied*, —— U.S. ——, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); *United States v. Doe*, 867 F.2d 986, 989 (7th Cir.1989) (scheme to defraud city of real estate taxes by granting assessment reductions); *United States v. Turoff*, 701 F.Supp. 981, 985 (E.D.N.Y.1988) (scheme to avoid payment of license-renewal fees); *United States v. Gill*, 673 F.Supp. 275, 281 (N.D.Ill.1987) (scheme to defraud county by diverting license fees).[9] The permit fees lost by the City of Boston constituted a loss of "money or property" under section 1341 sufficient to bring appellant's connivance within the statutory sweep.

## VI. CONCLUSION

We need go no further. This phoenix, consumed not by fire but by greed, will no longer fly. In the absence of any cognizable legal error, appellant's conviction must be, and hereby is,

*Affirmed.*

---

**9.** *United States v. Murphy*, 836 F.2d 248 (6th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988), and *United States v. Kato*, 878 F.2d 267 (9th Cir.1989), upon which Dray relies, are well wide of the mark. In *Murphy*, the defendant helped an ineligible organization obtain a bingo license in return for a weekly payoff *from the bingo operator*. 836 F.2d at 249. The Sixth Circuit held that the state's right to accurate permit-related information was an intangible right outside the scope of section 1341. *Id.* at 254. In that case, however, there is no indication that the state was deprived of a licensing fee or other monies. *Kato* is distinguishable on much the same basis. *See* 878 F.2d at 269.

APPENDIX

| Trial No.1 Count # | Trial No.1 Exhibit # | Trial No.2 Exhibit # | Document |
|---|---|---|---|
| 2 | 13 | 32 | 5/22/84 note from Ochs to TPA forwarding Dray's request for retainer and $125/hr fee |
| 3 | 14 | 33 | 5/29/84 bill from Dray to TPA for $1,687.50 relayed by Ochs with note asking for immediate payment |
| 5 | 15 | 34 | 6/11/84 check from TPA in payment of above bill |
| 4 | 16* | 35 | 3/27/85 bill from Dray to TPA for $30,000 |
| | 17 | 36 | 4/8/85 letter from Dray to Ochs explaining $30,000 bill (date-stamped 4/15/85) |
| 6 | 18* | 37 | copy of above letter sent by Ochs to TPA with handwritten explanatory notation |
| | 19 | 38 | 5/23/85 check from TPA to Dray in payment of above bill |

*These documents bore directly upon, but were not specifically pleaded in, the indicated counts.

---

## ON PETITION FOR REHEARING

Appellee petitions for rehearing, pointing out that, after oral argument in this matter, the Supreme Court, having previously denied the defendant's petition for certiorari in *United States v. Salamone*, 869 F.2d 221 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 246, 107 L.Ed.2d 196 (1989), granted the government's petition for certiorari therein, —— U.S. ——, 110 S.Ct. 830, 107 L.Ed.2d 826 (1990), vacated the judgment, and remanded to the United States Court of Appeals for the Third Circuit for further consideration in light of *Dowling v. United States*, —— U.S. ——, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). Appellee does not suggest that the result of our opinion will be affected (the government, after all, prevailed before us), but suggests that it was unnecessary for us to give any credence to the Third Circuit's *Salamone* opinion; and further suggests that any endorsement of *Salamone*, express or implied, may in the future prove mischievous.

The government is seeing ghosts where none exist. Although our panel opinion discussed *Salamone, see supra,* at 1138–39, we merely distinguished it from the case before us and ventured no opinion as to whether *Salamone* was or was not correctly decided by the Third Circuit. And, we fully considered the effect of the Court's opinion in *Dowling* on the case before us. *See, e.g., supra,* at 1136, 1136–37, 1140. Hence, rehearing or modification of our panel opinion is unnecessary.

The petition for panel rehearing is *denied.*